546 So.2d 659 (1989)
SUNSHINE JR. FOOD STORES, INC. and Joan W. Hilliard
v.
Veronica Mae AULTMAN, a Minor, By and Through her Mother, Ola Mae Aultman, Juel Burk Schultz and Billy Joe Schultz.
No. 58117.
Supreme Court of Mississippi.
May 10, 1989.
Rehearing Denied July 26, 1989.
James O. Dukes, Bryant, Stennis & Colingo, Gulfport, Alton R. Brown, Jr., Wayman W. McCranie, Jr., and Brown, Hudgens, Richardson, P.C. Mobile, Ala., for appellants.
Jimmy D. McGuire, Herman F. Cox, Thomas E. Vaughn, and Eaton & Cottrell, Gulfport, for appellees.
Before ROY NOBLE LEE, C.J., and ROBERTSON and PITTMAN, JJ.
ROY NOBLE LEE, Chief Justice, for the Court:
Veronica Mae Aultman, a minor, by next friend, Juel Burk Schultz and Billy Joe Schultz, filed separate complaints against Sunshine Food Stores and Joan W. Hilliard in the Circuit Court of Harrison County for damages, charging false imprisonment and negligent hiring against the defendants. The complaints were consolidated and, at the conclusion of all the evidence, the lower court directed a verdict in favor of the plaintiffs on the issue of false arrest and directed a verdict in favor of the defendants on the issue of negligent hiring. The case was submitted to the jury on the issue of damages only and, after deliberation, the jury returned a verdict in the sum of $150,000 for each plaintiff, aggregating $450,000.
Sunshine Food Stores and Joan W. Hilliard have appealed to this Court, assigning eight (8) errors in the trial below. The plaintiffs have cross-appealed and have assigned as error that the lower court committed reversible error in directing a verdict in favor of the defendants on the issue of negligent hiring, but asked this Court to consider such assignment only in the event that the Court finds reversible error in the direct appeal.

Facts
Appellant, Joan W. Hilliard, is a white female, approximately thirty-five (35) years of age born in 1954. She finished high school in Harrison County, Mississippi, and took accounting courses at Phillips College. In 1978, Joan began suffering severe mental problems. She was hospitalized at Keesler AFB and diagnosed as suffering from paranoid schizophrenia. Joan was hospitalized again in 1979 at Ft. Hood, Texas, suffering from the same condition.
In 1980, she returned to Harrison County and began out-patient treatment at the Gulf Coast Mental Health Center under the care of Dr. Maggio, a psychiatrist. Also in 1980, Joan was hospitalized twice, once in *660 July for 13 days and then in August at Whitfield, Mississippi. The Whitfield experience was by involuntary commitment because she was a danger to herself. She stayed at Whitfield until November of 1980. During these periods the diagnosis remained paranoid schizophrenia. In August of 1982, Joan was again involuntarily committed to Whitfield where she remained until December 27, 1982.
From August of 1981 through August of 1982, Joan was employed by the appellant, Sunshine Jr. Food Stores. During that period she had worked her way up from cashier to store manager. As stated, Joan became ill and had to be hospitalized in August of 1982. Upon her release from Whitfield, and sometime thereafter, she applied for re-employment with Sunshine. She filled out a new application and executed a medical records release. Sunshine never asked for those records, and only required Joan to obtain a letter from Dr. Bass, her treating psychiatrist, permitting her return to work. Dr. Bass supplied such a letter, stating only that she could return to work as long as she took her medicine.
Sunshine rehired Joan and she quickly worked her way back to the position of store manager. On the morning of February 29, 1984, Joan was at work when she again was stricken with one of her mental episodes and the following tragedy of errors occurred, giving rise to this suit.
Early on the morning of February 29, 1984, the young appellees, Juel Schultz, Billy Schultz and Veronica Aultman set about to run an errand. They stopped at the Sunshine Jr. Food Store to get some snacks, and the two young men went inside for refreshments. Once inside, they selected the desired items and went to the counter to pay for them. Several other customers were standing around the counter, but no clerk was to be seen. Juel looked around back of the counter where he saw Joan sitting in a back room, appearing to look ill. He asked her if she were O.K., and Joan responded she was fine and would be with them momentarily. When she failed to come to the counter, they replaced their items and began to leave. By this time the other customers had also left. On their way out the door, the two young boys passed a Mr. Lonnie Bobinger on his way in. Mr. Bobinger found no clerk inside, and he also looked in the back room and saw Joan sitting on the floor in a dazed condition. Fearing something was wrong, Bobinger called the police.
The first unit to arrive was Gulfport Police Lt. Jack Woodcock. He found Joan lying flat on her back behind the counter with her pants unzipped. Lt. Woodcock asked Joan what was wrong and Joan told him nothing, to go away. Knowing something had to be wrong, he questioned further and asked her, if she had been robbed and whether the robbers were white males. Joan verbally responded "Yes" and also shook her head "Yes."
Mr. Bobinger told Lt. Woodcock that two young white men had just left driving a car with a Texas tag. This happened to be the car that the appellees were driving. Woodcock radioed police headquarters and put out an all points bulletin on the car which the appellees were driving and on them.
Officer Dale Titler arrived at the store at 10:50 a.m., shortly after Lt. Woodcock, and continued the investigation, along with Detective Bryan Smith. He observed that Joan Hilliard appeared stuporous; that her voice was slurred, and she was incoherent at times; that she would not respond to all questions addressed to her; and that her questions were unreliable. At one point, she confirmed to the officers that her assailants had been five (5) years of age.
Paramedics arrived at 10:57 a.m. As the officers observed them, the medics conducted an examination of Joan Hilliard and found no evidence of any injury. She was transported to the hospital by the paramedics and Officer Titler continued his investigation there. He asked Joan if she had been sexually assaulted, to which she responded, "Yes." He asked this question because of her pants being unzipped at the scene. Upon receipt of this new information, Titler dispatched it to the units in the field.
*661 Lamar Barber, president of Inventory Specialists, Inc., of Birmingham, Alabama, had a contract with Sunshine to inventory and audit Sunshine stores. He happened to arrive at the store during the incident and was there while the policemen and medics conducted their investigation and examination. He knew nothing about Joan's mental illness, but he checked the store and advised the police officers that there had not been any robbery. This occurred while Joan was still in the store and none of that information was communicated to the police dispatcher or any of the units searching for the appellants.
By then, police officers from Gulfport and Biloxi were looking for two white males, driving a car with a Texas tag, which, in fact, was the appellees' car. The police thought that the suspects were armed and dangerous, and they were wanted for armed robbery and rape. At this time, a local TV station was monitoring the police traffic over a police scanner.
The appellees, oblivious to what was happening, were continuing on their merry way. While en route to the telephone company at Edgewater Mall, they noticed an unusual number of police cars around them. Upon pulling into the lot of Edgewater Mall, they were cut off and surrounded by police cars. Like bloodhounds on the trail, the local TV news crew, with cameras, were present.
A large contingent of police officers sprang from their cars pointing handguns and shotguns at the befuddled young people, ordering them out of their car and placing them under arrest for armed robbery and rape. They were told to get their hands in plain view or they would be shot. The appellees were removed from the vehicle, lined up against it and searched. They were then placed belly down on the asphalt lot. Appellee, Veronica Aultman, was eight months pregnant at the time. Suddenly, a gust of wind caught Aultman's skirt and blew it up, exposing her. This startled the officers who thought she might be going for a gun and, according to appellees' testimony, the officers began pumping shotguns, cocking pistols and screaming at the appellees, "Don't nobody move or I'll blow your m____ f____ head off now." During all this time the TV film crew was obtaining a great story for the 6 and 10 p.m. news.
The appellees, with their hands cuffed behind their backs, were pulled up off the ground, and transported to the Gulfport Police Department. At the police station, they were chained to the floor, taken one-by-one into an interrogation room and questioned at great length. Their mug shots were taken, and only after several hours was it finally determined that a mistake had been made and there was nothing to the entire episode.
The appellees were released from custody. At home they saw and relived the entire event again on the 6 and 10 o'clock news. The news story did say that the arrest had been a mistake.
Appellant, Joan Hilliard, testified that she could remember none of the details of the incident. Her psychiatrist, Dr. William Bass, testified as to Joan's mental illness and its long history. Mr. Bobinger testified about the matter and stated that he may or may not have told the police over the phone that he thought a crime had been committed. Mr. Barber, the auditor, testified that he told the police he didn't see any evidence of an armed robbery.

Law

I.  II.

THE LOWER COURT ERRED IN DIRECTING THE VERDICT FOR THE APPELLEES ON THE ISSUE OF FALSE ARREST.

THE LOWER COURT ERRED IN FAILING TO DIRECT A VERDICT FOR THE APPELLANTS.
The appellants have assigned eight (8) errors in the trial below. The assigned errors I and II are dispositive of the case and we will not address the other questions.
The basic facts of this case are uncontradicted. On such facts, we must determine whether or not as a matter of law the appellants were guilty of negligence which *662 proximately caused or contributed to the undisputed false arrest of the appellees. While we find no case in this jurisdiction on all fours with the facts here, this Court has spoken in other cases which lead the way.
In Godines v. First Guaranty Savings & Loan Ass'n, 525 So.2d 1321 (Miss. 1988), two minors sued First Guaranty Savings & Loan Association and James P. Achee, its agent, for false arrest and false imprisonment. The lower court granted summary judgment and this Court reversed and remanded for a trial. In the case sub judice, the facts were fully developed, and after trial on the merits, the lower court granted a directed verdict on the issue of false imprisonment for the appellees. This Court said in Godines:
The controlling issue on appeal is whether Achee's actions as outlined above present a factual dispute as to whether Achee procured or instigated Phillips' arrest.
525 So.2d at 1323.
Phillips was driven by his friend, Godines, to the bank for the purpose of cashing a sixty dollar ($60.00) check. Achee, the bank teller, was suspicious of Phillips, waited upon him, questioned Phillips about an account in the bank and observed his actions, instructed an employee to call the police about a suspicious person (Phillips) and talked to the police department over the telephone in the presence of Phillips under a code signal which meant that one person was robbing the bank. Achee paid the check with money which set off a silent alarm from the bank. Two policemen answered the call, arrested Phillips and Godines and took them to the police department where they were interrogated from forty-five (45) minutes to one and one-half (1 1/2) hours. This Court said in Godines:
However, this Court has acknowledged that before a person may be held liable for causing false imprisonment through false arrest, that person "must have personally and actively participated therein directly or by indirect procurement." Smith v. Patterson, 214 Miss. 87, 93, 58 So.2d 64, 66 (1952). See Prosser and Keeton on the Law of Torts 52 (5th Ed. 1984). Procurement is not broadly defined, however.
Again in Patterson, the Court, quoting from American Jurisprudence, stated:
Where a person merely directs the attention of a public officer to what he supposes to be a breach of the peace and the officer, without other direction, arrests the offender on his own responsibility, the person who did nothing more than to communicate the facts to the officer is not liable for causing the arrest, even though it is made without a warrant. If the arrest is made without the knowledge and consent of such person, there is no liability.

Id. at 94, 58 So.2d at 66.
* * * * * *
In Lenaz v. Conway, 234 Miss. 231, 105 So.2d 762 (1958), the Court upheld a jury verdict for defendant on conflicting evidence of whether defendant caused a warrantless arrest. The defendant's proof at trial was that he merely related facts without any other direction to police. The Court cited Patterson, supra.

This Court's opinion in Patterson and Lenaz seem to follow the general law. See generally, Annot. 21 A.L.R.2d 643, 694 § 23 (1952 & Supp. 1987). Restatement (Second) of Torts § 45A states:
One who instigates or participates in the unlawful confinement of another is subject to liability to the other for false imprisonment.
In comment c the Restatement authors explain what amounts to instigation:
Instigation consists of words or acts which direct, request, invite or encourage the false imprisonment itself. In the case of an arrest, it is the equivalent, in words or conducts, of "Officer, arrest that man!" It is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them.

*663 Thus, the major question is whether Achee's actions were the equivalent, in words or conduct, of stating, "Officer, arrest that man!" See Howell v. Viener, 179 Miss. 872, 176 So. 731 (1937) (defendant called on police to arrest plaintiff and charged him with being a counterfeiter).
525 So.2d at 1324.
In Smith v. Patterson, supra, one of the defendants telephoned police and identified the plaintiff as a person matching the description of the individual who had written a fraudulent check. The defendant requested that the police investigate the matter and the plaintiff was later arrested. Identification of the plaintiff turned out to be erroneous, but the Court held that where the defendant merely directed the attention of the police officers to a proposed illegal vicious person without directly or indirectly procuring the arrest, there was no liability.
The case of Green v. Donroe, 186 Conn. 265, 440 A.2d 973 (1982), furnishes an interesting comparison with the case sub judice. The Connecticut Supreme Court stated the following facts of the case:
On January 26, 1978, the named defendant (hereinafter the defendant), who was at the time emotionally disturbed, shot himself in the shoulder while he was at his place of employment, a package store in West Haven. He contacted the local police and when they arrived, he said that he had been robbed and shot by a black male wearing a green jacket and blue hat, that his assailant had a medium skin tone, a round face, a medium build and was about five feet ten inches in height. He lied to the police because he could not tolerate admitting that he had shot himself.
Wholly by chance, the police picked up the plaintiff, a black man who was wearing a green jacket, and brought him to the defendant. When defendant did not identify him, the plaintiff was released. He was detained by the police for approximately ten minutes and suffered no other harm as a result of the incident. In a subsequent interview with the police at the hospital, the defendant admitted that he had shot himself because of an emotional disturbance resulting from a marital dispute and that his report of the robbery was a hoax.
440 A.2d at 974.
The Court found that the false information was motivated solely by the defendant's embarrassment over shooting himself and was not done for the purpose of causing the arrest of the plaintiff or of anyone else. There was no evidence that he expected or intended that any arrest be made, and he had not directed or instigated an arrest. The Connecticut Supreme Court affirmed the trial court's entry of a directed judgment.
In the present case, Joan Hilliard did not direct, request, invite or encourage the false arrest of the appellees. The interrogation of her was by leading and suggestive questions propounded by the investigating officer while she was in a stuporous condition. There was no evidence at the scene or anywhere else that a crime had been committed, e.g., robbery and/or rape. For a period of at least fifteen (15) minutes prior to the arrest of the appellees, officers at the scene on Sunshine's premises and at the hospital where Joan Hilliard was taken were aware that no crime had been committed. It is obvious that the sole proximate cause of the false arrest of appellees was the overzealous and uncoordinated activity of the police leading up to and effecting the arrest of appellees.
We are of the opinion that the lower court erred in declining to enter a directed verdict for the appellants on the issue of liability and the judgment of the lower court must be reversed and judgment rendered here for the appellants.

Cross-Appeal
The decision of this Court on the direct appeal disposes of the cross-appeal. Negligent hiring of Joan Hilliard, if such it was, would not have been a contributing cause to the false imprisonment of appellees. The issue of responsibility for the false arrest determines the rights of the parties. Had she, on account of her mental condition, *664 directly accused, "Officer, arrest that man!" or instigated appellees' arrest, a different situation would present itself. Likewise, if, on account of her mental condition, she was under the delusion that the appellees were robbing her and the store, and had injured them by shooting or otherwise, a different situation would arise.
The judgment of the lower court is reversed and judgment is rendered here for the appellants. The judgment is affirmed on cross-appeal.
REVERSED AND RENDERED ON DIRECT APPEAL; AFFIRMED ON CROSS-APPEAL.
HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.
DAN M. LEE, P.J., dissents without separate written opinion.